CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 16 2012

JULIA C. DUDLEY, CLERK
BY: /s/ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **JEFFREY LINKOUS,** | ) | Civil Action No. 7:10-CV-00107 |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| **CRAFTMASTER MANUFACTURING, INC.,** | ) | |
| | ) | By: Hon. James C. Turk |
| Defendant. | ) | Senior United States District Judge |

This case comes before the Court on defendant's Motion for Summary Judgment (Dkt. No. 8) and plaintiff's Opposition. (Dkt. No. 13). The plaintiff subsequently filed a motion for adoption of his oral argument. (Dkt. No. 21). The parties were heard on June 25, 2012, and the matter is now ripe for disposition. For the reasons set forth below, defendant's Motion (Dkt. No. 8) is **GRANTED**.

I.   **Factual and Procedural Background**

Plaintiff Jeffrey Linkous ("Linkous") brought this action under the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). Linkous alleges that defendant CraftMaster Manufacturing, Inc. ("CraftMaster") unlawfully denied him an accommodation for a disability as required under the ADA, and terminated him as retaliation for opposing sexual harassment in violation of Title VII "and/or because of his disability and/or perception that he was disabled and/or the failure to grant an accommodation in violation of the ADA." (Dkt. No. 1 at 1).

1

### A. Defendant's Employment at CraftMaster

During 2006 and 2007, Linkous was employed as a truckloading specialist at CraftMaster, a company that manufactures and sells doors for residential use, at the company's warehouse in Christiansburg, Virginia. (Dkt. No. 13 at 4). Neither party disputes that Linkous is an employee under the meaning of both the ADA and Title VII, and that CraftMaster is an employer under the same. When Linkous's employment ended with CraftMaster, in October 2007, he had worked for the company on two separate occasions, and continually since 1996. Id.

The parties dispute the quality of Linkous's performance as an employee. Both parties agree that Linkous was disciplined at least four times between August 2006 and October 2007, and multiple times in preceding months for offenses including poor performance and insubordination. (Dkt. No. 13 at 5, Dkt. No. 9 at 5). Linkous claims, however, that he was singled out for heightened punishment relative to peer employees because he repeatedly defended a victim of sexual harassment, and subsequently participated in a workplace investigation of these events in August 2006. (Dkt. No. 13 at 5).

### B. Plaintiff's Role in a Workplace Sexual Harassment Incident

On August 21, 2006, CraftMaster began an investigation regarding the alleged sexual harassment of an employee. Linkous was one of several employees interviewed during the investigation. (Dkt. No. 15 at 9). The testimony of Linkous, the victim, and other employees confirmed the existence of improper conduct by two employees. CraftMaster terminated one of the employees, a warehouse manager, as a result of this improper conduct. (Dkt. No. 9 at 4). The parties dispute Linkous's role in the sexual harassment episode, however. CraftMaster refers to Linkous having "a limited role as a corroborating witness," whereas Linkous expressly challenges this characterization as insufficient. (Dkt. No. 9 at 18, Dkt. No. 13 at 6).

2

Linkous claims that he served as a frequent defender of the victim throughout the workplace harassment. In retaliation for this role, Linkous claims he was subjected to heightened punishment for actions relative to peer employees. (Dkt. No. 13 at 5) Linkous asserts his supervisor was incentivized to remove him through disciplinary means because the supervisor would be able to more easily harass his victim if Linkous was gone. Id. Linkous also claims that after the investigation, the reported sexual harassment continued from a different supervisor who received a warning during the investigation, but was not terminated. Linkous contends that this continued harassment eventually resulted in the resignation of the victim. (Dkt. No. 13 at 8). Linkous claims that he continued to defend the victim during this period, and that he continued to experience retaliatory treatment from supervisors throughout the remainder of his tenure with CraftMaster. Id. Linkous also claims that he was denied an opportunity to apply for assistant warehouse manager and was given the reason that he had "a big mouth and start[ed] too much shit." (Dkt. No. 13 at 2). Craftmaster presents evidence that there was no such promotion as Linkous claimed. (Dkt. No. 15 at 11). Linkous claims that the retaliatory treatment culminated when he was fired for not taking a drug test.

Linkous and CraftMaster disagree as to whether Linkous faced disparate treatment than coworkers. Linkous points to coworker John Dobbins, who was not fired after failing a drug test, as evidence of disparate treatment. (Dkt. No. 13 at 16). As Dobbins had received written warnings and had been put on probation for both safety violations and unexcused absences, Linkous claims that he and Dobbins had similar disciplinary records. Linkous claims that their different treatment was part of the retaliatory treatment that followed Linkous's participation in the sexual harassment investigation. Id.

CraftMaster offers evidence that Dobbins was situated differently from Linkous under their testing policy and that of the testing company. Dobbins took and failed a drug test, whereas Linkous's first test appeared altered. Dobbins was then offered the opportunity to participate in drug treatment, whereas Linkous was offered a follow-up test but refused to submit a sample. CraftMaster argues that they did not see Dobbins and Linkous as similarly situated given these factually different circumstances. CraftMaster also presents evidence that in the past, it has terminated an employee for providing a seemingly adulterated sample without allowing the employee an opportunity for a retest. (Dkt. No. 15 at 5).

### C. Plaintiff's Non-submission to Observed Drug Test

Linkous was terminated after a scheduled follow-up drug test in which he did not provide a necessary urine sample. Per the policy of both CraftMaster and the testing company, this qualified as a positive test. (Dkt. No. 9 at 8). This drug test was scheduled following a random drug test on September 19, 2007, which the testing company thought had been altered. (Dkt. No. 13 at 11, Dkt. No. 9 at 6). Following this suspicious test, the testing company asked Linkous to submit to an observed drug test at their office. Id. The parties dispute the factual circumstances of this test, but both parties agree that Linkous did not urinate and that the testing company considered this a positive test. After the testing company advised CraftMaster that Linkous "refused to submit" to the test, CraftMaster terminated Linkous because the testing company considered refusal a positive test under the procedures of both CraftMaster and the testing company. (Dkt. No. 9 at 7, Dkt. No. 13 at 11).

Both parties agree that Linkous went to the testing facility, was asked to urinate in the presence of a doctor, and did not do so. (Dkt. No. 9 at 7, Dkt. No. 13 at 12). The parties also agree that after a period of waiting, the doctor had to leave, and as the test was required to be

4

observed, the doctor asked Linkous to urinate in the presence of a CraftMaster supervisor. Id. Linkous claims that he attempted to complete the drug test, and left only after an hour and a half of failed efforts. (Dkt. No. 13 at 12). CraftMaster claims that Linkous refused to urinate in front of the supervisor and left the premises following the doctor's request. (Dkt. No. 9 at 7).

Linkous claims that he was unable to urinate because he suffers from paruresis, more commonly known as "shy bladder syndrome," which wholly prevented him from being able to submit to a drug test in which someone had to watch him urinate. (Dkt. No. 13 at 13). Linkous contends that he has suffered from this affliction since his teenage years and that if "[his supervisors] did not know this information, it is because they had not bothered to ask." (Dkt. No. 13 at 12). As evidence of his paruresis, Linkous offers testimony from a professor that his case "appears to be a classic case of paruresis." (Dkt. No. 13 at 14). This professor reviewed an affidavit listing Linkous's alleged symptoms, but never evaluated or spoke to Linkous in person. Linkous does not proffer evidence that he explicitly informed either the testing company or CraftMaster of his diagnosis of paruresis at any point prior to his termination. Linkous also does not submit evidence that he ever asked for or needed any sort of accommodation for his paruresis at work.

## II. Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.) (citations omitted), cert. denied, 513 U.S. 813 (1994). A genuine issue of material fact exists when a rational factfinder, considering the evidence in the summary judgment record,

could find in favor of the non-moving party. Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009). However, "[g]enuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984). Furthermore, "the mere existence of a scintilla of evidence in support" for the nonmovant's position will not defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A summary judgment motion should not be granted "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Campbell v. Hewitt, Coleman, & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994). Summary judgment should be entered, however, if the Court finds, after a scrupulous review of the record, that no reasonable jury could return a verdict for the non-moving party. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996).

## III. Analysis

### A. Plaintiff's Americans with Disabilities Act Claim

Plaintiff claims that 1) under the ADA, shy bladder syndrome is a disability, and 2) a reasonable juror could conclude based on this record that CraftMaster fired him because of his disability. (Dkt. No. 13 at 22).

In determining whether paruresis is a disability under the ADA, a review of the case law shows that there are no cases in the Fourth Circuit that determine that "shy bladder syndrome," or paruresis, is a disability recognized under the ADA. Plaintiff cites the "leading case on shy bladder syndrome," Kinneary v. City of New York, 601 F.3d 151, 157 n.3 (2d Cir. 2010), but in this case, the Second Circuit expressly did "not resolve whether 'shy bladder syndrome' can be a disability under the ADA." To determine whether plaintiff had a disability under the ADA, this

court must look to the ADA effective at the time of his termination in October 2007. See Cochran v. Holder, 436 F. App'x. 227 (4th Cir. 2011) (holding that the ADA Amendments Act of 2008 does not apply retroactively). The pertinent version of the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102. The plaintiff is thus required to make a three-part showing and prove "(1) that he has a physical or mental impairment, (2) that this impairment implicates at least one major life activity, and (3) that the limitation is substantial." Heiko v. Colombo Savings Bank, 434 F.3d 249, 254 (4th Cir. 2006).

In determining whether a disability has been established under the ADA, the Supreme Court created a "demanding standard" in Toyota Motor Mfg. v. Williams, 534 U.S. 184, 197-98 (2002), by strictly interpreting this definition to require that to have a disability, one "must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." (emphasis added). The Supreme Court went on to hold that merely having a medical impairment does not make one disabled for the purposes of the ADA. Id. Whether an individual has a disability depends on the effect of the impairment, not the diagnosis. Id. In the case at hand, plaintiff's only evidence that he has an impairment at all is his own testimony. He never discussed his impairment with his employer or ever sought advice about it from a medical professional. Regardless, even if plaintiff had been diagnosed with paruresis, the determination of whether he had a disability would come from the effect the paruresis had on the plaintiff, not the fact that he had paruresis. This Court will assume, arguendo, that plaintiff has met the first part of his required burden that he has "an impairment."

Plaintiff must also show that his impairment affected a major life activity. In Heiko, the Fourth Circuit determined that the "elimination of bodily waste" was a major life activity. Heiko,

7

434 F.3d at 255. As urination is an elimination of bodily waste, plaintiff has met the second part of his required showing.

To meet the third part of plaintiff's required burden, plaintiff must show that his impairment caused a substantial limitation on his ability to urinate. Under the Supreme Court's "demanding" standard in Toyota, an impairment must "prevent or severely restrict" an activity to be a substantial limitation. Toyota, 534 U.S. at 197-98. In Heiko, the Fourth Circuit held that "sporadic or otherwise temporary impairments do not qualify as substantial limitations." Heiko, 434 F.3d at 257. Under this framework, plaintiff cannot meet the third required showing that his limitation is substantial, and his claim that he has a disability under the ADA fails.

In the present case, plaintiff gives only one specific example of being completely unable to urinate because of his disorder, which was during his observed drug test. While plaintiff claims that he experienced difficulty in public urinals or when asked to urinate under direct observation, he was able to manage these difficulties by simply using a bathroom stall and closing the door, or using the restroom when others were not present. Plaintiff presents no evidence that his impairment prevented or severely restricted his ability to urinate at work or in the community, which counsels against finding his impairment was substantial.[1] Plaintiff's success at managing his difficulty was shown by the fact that he never notified his long-term employer of his paruresis or sought medical treatment for his disorder.

As plaintiff demonstrates only one example of a restriction severe enough to actually prevent him from being able to urinate at all, as such, his impairment is at most "sporadic," and it

---

[1] When determining if a plaintiff suffers a substantial limitation under the ADA, the corrective measures that the individual has employed are relevant to the determination. Sutton v. United Airlines, Inc., 527 U.S. 471 (1999). If a plaintiff employs corrective measures that sufficiently blunt the impact of the impairment, then the plaintiff is not disabled under the ADA because the plaintiff's impairment does not rise to a substantial limitation. Id. at 482-83. In the present case, Linkous has indicated only one instance where he was prevented from urinating, and in every other instance, he was able to mitigate his impairment by using a stall or an empty restroom.

8

cannot qualify as a substantial limitation. Heiko, 434 F.3d at 257. In Rohan v. Networks Presentations LLC, 375 F.3d 266, 268-9 (4th Cir. 2004), a plaintiff suffered from episodes where she was incapable of interacting with others, which were symptomatic of post traumatic stress disorder and severe depression following childhood sexual abuse. The Fourth Circuit held that 30 of these episodes, which lasted as much as 30 minutes each, were "sporadic" and that this volume was "insufficient to establish a substantial limitation on a major life activity." Id. at 276. Linkous's alleged condition, as he has demonstrated only one instance where he was prevented from urinating, is much more sporadic and cannot be considered "substantial" under this precedent.

Additionally, the holding in Rohan shows that even limitations that have a severe impact on a person's life can be found not substantial enough to constitute a disability. Despite the fact that Rohan's condition rendered her completely incapable of interacting with others, the Fourth Circuit found even this severe limitation did not qualify as a substantial limitation. Id. Similarly, in Boerst v. Gen. Mills Operations, Inc., 25 F. App'x. 403, 408 (6th Cir. 2002)(unpublished), the court found that the limitation of plaintiff's sleep to between two and four hours per night "d[id] not rise to the level of a disability under the ADA." This plaintiff had his ability to engage in a major life activity cut in half, and the court found that this was not a substantial limitation. Linkous's impairment, which he claims has caused him difficulty only in crowded restrooms and at urinals, is much less severe than many impairments that were found not substantial enough to constitute disabilities.

As the plaintiff in Heiko was found to actually have a substantial limitation, and one affecting the same major life activity as that which Linkous claims, a comparison between the factual circumstances in that case and the present one further shows why Linkous does not meet

9

his necessary burden. In Heiko, "to accomplish the equivalent of urination, Heiko had to insert a needle into his surgically-fashioned fistula and tether himself to a dialysis machine three afternoons per week, for a total of three hours." Heiko, 434 F.3d at 257. Whereas Heiko had to undergo this painstaking process to "urinate" at all, plaintiff does not claim that there is anything that physiologically stops him from urinating like anyone else. He is fully capable of urinating as long as he has a measure of privacy, which a stall door or empty restroom can easily provide. Heiko shows that the burden to establish a disability is especially high. Plaintiff's impairment does not come close to the level of severity necessary to constitute a substantial limitation of his ability to urinate.

Linkous has failed to show that his impairment causes a "substantial limitation" to the major life activity of urination. His impairment is also at most "sporadic," and subsequently cannot qualify as substantial. Additionally, impairments more severe than that from which plaintiff claims he suffers have been found not substantial. Plaintiff cannot meet the burden to establish that he has a "disability" under the ADA. As plaintiff is not disabled under the ADA, he can have no claim for wrongful discharge based on his alleged disability.

### B. Plaintiff's Title VII Retaliation Claim

Plaintiff also brings a Title VII claim alleging that his termination was in retaliation for his role in an incident of sexual harassment and his participation as a witness thereof. Title VII's anti-retaliation provision forbids an employer from discriminating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To bring a claim for retaliation, plaintiff has the initial burden to establish a prima facie case, which he can satisfy by making a three-part showing (1) that he engaged in a protected activity; (2) CraftMaster acted

adversely against him; and (3) the protected activity was causally connected to the adverse action. Holland v. Washington Homes, Inc., 487 F.3d 208 (4th Cir. 2007). Assuming arguendo that Linkous can present a prima facie case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). "This burden, however, is a burden of production, not persuasion." Washington Homes, Inc., 487 F.3d at 214. Once the employer has shown this, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext.'" Hill, 354 F.3d at 285 (quoting Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. at 143). See also Darvishian v. Green., 404 F. App'x. 822, 828 (4th Cir. 2010).

Plaintiff has shown that he has engaged in the protected activity of testifying in a workplace sexual harassment investigation, and that CraftMaster terminated his employment. He has thus satisfied the first two parts of his required prima facie case. While this Court does not think that Linkous has met his burden of showing causation, even if plaintiff had established his prima facie case, he cannot succeed on his retaliation claim because he cannot prove that CraftMaster's reason for terminating him was a pretext for discrimination.

CraftMaster presented evidence that Linkous was terminated because CraftMaster believed that Linkous had refused to take a follow-up drug test. As this drug test was a follow-up drug test after Linkous's first test appeared to have been altered, the Company determined that Plaintiff appeared to be "an insubordinate drug user trying to avoid detection." (Dkt. No. 9 at 16). Even if CraftMaster's belief that plaintiff had refused to provide a sample was mistaken, and plaintiff was prevented from doing so because of his shy bladder syndrome, "as long as the employer discharged the employee because it honestly believed that the employee had engaged

11

in misconduct, then the employer has not discriminated on the basis of disability." Pence v. Tenneco Auto. Operating Co., 169 F. App'x. 808, 811 (4th Cir. 2006). Thus, Craftmaster's decision to terminate Linkous based on the testing company report that Linkous had refused to take the follow-up test was not discrimination.

Because CraftMaster has articulated a non-discriminatory reason for terminating Linkous, the burden shifts to Linkous to show that CraftMaster's proffered reason was a pretext for retaliation. Linkous could demonstrate pretext by showing that CraftMaster's "proffered explanation is unworthy of credence." Holland, 487 F.3d at 218 (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). Plaintiff cannot meet this burden, however, because CraftMaster showed that it terminated Linkous in accordance with its own drug policies. Therefore, the termination was not a pretext.

Plaintiff attempted to provide evidence that John Dobbins kept his job under the same circumstances under which plaintiff was terminated. Linkous claims that he and Dobbins were similarly situated with regard to their disciplinary records, and that retaliation can be inferred from CraftMaster's disparate treatment of Dobbins's failed test and Linkous's disputed tests. CraftMaster shows that Dobbins took and failed one test; however, Linkous submitted a suspicious sample and then refused to take another test. Under the policies of CraftMaster and the testing agency, Linkous's two disputed tests are not similarly situated to Dobbins's one failed test. (Dkt. No. 15 at 5). Plaintiff has not showed any reason why CraftMaster's reason for giving different treatment to these two factually different circumstances is unworthy of credence. CraftMaster also presents evidence that it has terminated an employee for providing a seemingly altered first sample without allowing that employee an opportunity to retest. As plaintiff similarly provided a seemingly altered sample but was allowed the opportunity to provide a

retest, plaintiff cannot show that he was singled out for disparate treatment by CraftMaster. Thus, regardless of whether plaintiff can make a prima facie case, plaintiff's Title VII claim must fail because he cannot show a retaliatory pretext by rebutting CraftMaster's legitimate reason for terminating him.

Furthermore, the Court believes that plaintiff has failed to make the required showing of causation to present a prima facie case. Plaintiff does not present enough evidence for a reasonable jury to infer that he was terminated because of his participation in the sexual harassment investigation. Some plaintiffs bringing Title VII claims are able to satisfy the causation requirement by showing a close temporal proximity between a protected activity and an adverse employment action. As plaintiff was terminated 14 months after engaging in a protected activity, however, he cannot demonstrate a causal inference based on temporal proximity alone. See Booth v. Maryland, 337 F. App'x. 301, 310 (4th Cir. 2009) (stating a nine month gap between the protected activity and adverse employment action could not support an inference of causation); see also Pascual v. Lowe's Home Centers, Inc., 193 F. App'x. 229, 233 (4th Cir. 2006) (stating a three to four month period too long of a period to establish a causal connection between these events).

Other courts have allowed plaintiffs to satisfy the causation requirement by showing a combination of factors. See Farrell v. Planters Lifesavers Co., 206 F.3d 271 (3d Cir. 2000). "Factors pertinent to the causation element may include temporal proximity between the two events, an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action, and differential treatment of other employees." Jaudon v. Elder Health, Inc., 125 F. Supp. 2d 153, 165 (D. Md. 2000) (citing Farrell, 206 F.3d 271, 279-81). Because plaintiff has no evidence of temporal proximity and has not offered any evidence that CraftMaster has offered

13

inconsistent reasons for his termination, plaintiff must rely on an intervening pattern of retaliatory conduct to prove causation.

Plaintiff argues that he was subjected to a variety of forms of retaliatory conduct surrounding his appearance as a witness in the sexual harassment investigation. Plaintiff claims that he was denied an opportunity to apply for assistant warehouse manager and given as a reason that "[he] had a big mouth and start[ed] too much shit." (Dkt. No. 13 at 2). Linkous claims that comment is an example of retaliatory conduct on the part of the CraftMaster supervisor because of Linkous's role in the sexual harassment investigation. Regardless of what the manager may or may not have said, "juvenile [...] [and] disparaging comments, while unpleasant, do not evince a pattern of retaliatory conduct." Bryan v. Lucent Technologies, Inc., 307 F. Supp. 2d 726, 741 (D.Md. 2004). Linkous also claims that the investigated sexual harassment did not end with the investigation, and that he continued to experience retaliatory treatment because of his role in defending the victim. Plaintiff presents no evidence, however, that he or the victim ever made another complaint to CraftMaster concerning this continued treatment. (Dkt. No. 15 at 9-10).

Regarding Linkous's claims of CraftMaster's differential treatment of other employees, this Court addressed plaintiff's claims about John Dobbins earlier in the opinion. Plaintiff also claims that he received heightened punishments for workplace incidents as retaliation, and gives an example where a fellow employee received a written warning for an incident of insubordination whereas Linkous was suspended for three days for a similar incident. (Dkt. No. 13 at 10). But "[m]erely labeling conduct as retaliatory does not make it so." Bryan, 307 F. Supp. 2d at 741. The factual record makes clear that different employees received different punishments at different times for different incidents.

14

Finally, Linkous gives no credible explanation for why CraftMaster declined to terminate him for any one of his several disciplinary incidents between September 2006 and September 2007. (Dkt. No. 15 at 12, Dkt. No. 9 at 5). Indeed, CraftMaster had the authority to terminate plaintiff numerous times prior to his actual termination and chose not to do so. Linkous would have the Court believe that CraftMaster waited until over a year after his participation in the protected investigation to fire him. Given the intervening opportunities for CraftMaster to fire Linkous, Linkous's charge of retaliation lacks credibility. Furthermore, when CraftMaster finally did fire Linkous, they articulated a clear reason for doing so that complied with company policy. Thus, Linkous cannot meet the required burden for his Title VII retaliation claim. He has failed to make out a prima facie case and more importantly, even if he could make a prima facie case, Linkous cannot show that CraftMaster used a pretextual reason to fire him.

## IV. Conclusion

The Court finds that Linkous has failed to offer sufficient evidence from which a reasonable jury could find either unlawful discrimination or retaliation. Accordingly, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment, is **GRANTED** in its entirety. The Clerk of Court is directed to send a copy of this Memorandum Opinion and accompanying Final Order to all counsel of record.

ENTER: This  16th  day of July, 2012.

Senior United States District Judge